IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>EDWIN AMAYA,<br><br>    Defendant. | ORDER AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:12-cr-82 |

  Edwin Amaya claims that he was unlawfully detained and arrested after a traffic stop that occurred on February 1, 2012. He requests the suppression of all evidence that was obtained in violation of the Fourth Amendment of the United States Constitution. Because the court finds that no violation occurred, Mr. Amaya's motion to suppress is DENIED.

BACKGROUND

  On February 1, 2012, Sergeant Jared Garcia was watching a house in Magna, Utah, after receiving information from undisclosed individuals that the house was known for drug and gang activity. (Tr. of Evid. Hr'g 6, 10, 18, May 24, 2012.) A car pulled up to the house and one of the passengers walked into the house, returning to the car two minutes later. (Tr. at 6-7.) Because Sergeant Garcia could not see a license plate on the car, he followed the car as it left the house and then pulled it over. (Tr. at 7, 19.) He then discovered that the license plate lamps were not working. (Id.)

  Sergeant Garcia walked up to the car and knocked on the rear driver's side window. (Tr.

at 8.)  He requested that the backseat passenger, Lori Kay, roll down the window.  (Id.)  Instead, Ms. Kay opened her door and Sergeant Garcia testified that he could smell an odor consistent with methamphetamine coming from the car.  (Tr. at 8, 19.)  He then spoke briefly with the driver, Shylynn Ellis, and requested her driver's license, registration, and proof of insurance.  (Tr. at 9.)  Sergeant Garcia noticed that the passenger in the front seat, Edwin Amaya, had bloodshot eyes, bags under his eyes, was breathing heavily, and appeared drowsy.  (Id.)  Sergeant Garcia also observed that Mr. Amaya was wearing a blue shirt and had a tattoo on his left wrist that appeared to be a possible gang symbol.  (Tr. at 10-11.)  Sergeant Garcia testified that the blue shirt was consistent with clothing worn by the prevalent gang in that area of Magna, the Sureños.  (Tr. at 11, 34.)  When Sergeant Garcia asked Mr. Amaya if he was documented as a gang member, Mr. Amaya became agitated and said that he was not a gang member.  (Tr. at 11.)

      Sergeant Garcia returned to his patrol car to run a records check on Ms. Ellis, Ms. Kay, and Mr. Amaya.  (Tr. at 12.)  At this point, Deputy U.S. Marshall Richard Simonelli arrived as a back up.  (Id.)  Sergeant Garcia told Deputy Simonelli that there could be drugs in the car because of the odor of methamphetamine, the behavior and appearance of Mr. Amaya, and the car's two-minute stop at a known drug residence.  (Tr. at 13, 32.)  In his testimony, Deputy Simonelli recalled that Sergeant Garcia mentioned Mr. Amaya's evasive behavior and the tattoo on his wrist.  (Tr. at 35.)  Deputy Simonelli ran a records check on Mr. Amaya and determined that Mr. Amaya was on federal probation and was documented as a Sureños gang member.  (Tr. at 20-21, 33.)  Deputy Simonelli testified that he was also aware that Ms. Ellis was on federal probation, and that typically people on federal probation are not to associate with each other.  (Tr. at 32-33.)

Sergeant Garcia returned to the car to speak with Ms. Ellis. (Tr. at 14, 36.) While she denied any drug use, she admitted that she was on federal probation and gave Sergeant Garcia consent to search the car. (Tr. at 14.) Sergeant Garcia then spoke to Ms. Kay, who told him that she had used methamphetamine within the past two hours. (Tr. at 14-15.)

Meanwhile, Deputy Simonelli approached Mr. Amaya's window and knocked on it. (Tr. at 37, 53.) Instead of rolling down the window, Mr. Amaya got out of the car. (Id.) Deputy Simonelli asked Mr. Amaya about his gang affiliation, and mentioned that Mr. Amaya was documented as a Sureño. (Tr. at 37.) Mr. Amaya denied any gang membership and responded that for some reason he was recorded as a Crip. (Id.) Mr. Amaya also stated that he was on federal probation for a "gun charge." (Tr. at 39.) During this conversation, Deputy Simonelli observed that Mr. Amaya appeared nervous, that he kept moving around, and that he was sweating. (Id.)

Deputy Simonelli testified that he has extensive gang related training and that he noticed that Mr. Amaya's blue shirt and blue lanyard were consistent with clothing worn by the Sureño gang. (Tr. at 25-30, 38.) Deputy Simonelli told Mr. Amaya that he would like to see his belt, since it is common for gang members to wear a webbed cloth belt of the same color as their gang affiliation. (Tr. at 41-42.) Deputy Simonelli reached out to raise the left side of Mr. Amaya's sweatshirt and shirt, but Mr. Amaya immediately put his right hand down on his right front side. (Tr. at 41, 44, 54-55.) As a result, Deputy Simonelli was unable to lift Mr. Amaya's sweatshirt, and it is unclear whether he even touched the shirt. (Tr. at 42-43, 54.)

Deputy Simonelli told Mr. Amaya to go to the back of the car and place his hands on top of his head. (Tr. at 44-45, 55.) After Deputy Simonelli put his hands on top of Mr. Amaya's

hands, he told Sergeant Garcia that Mr. Amaya had reached for his right waistband. (Tr. at 15, 44-45.) Immediately after, Mr. Amaya broke free from Deputy Simonelli's grasp and fled. (Tr. at 15, 45.) Deputy Simonelli yelled at him to stop and then deployed his taser, but the stun was ineffective. (Tr. at 16, 46, 50-51.) Mr. Amaya ran toward a fence near the road and appeared to throw something over the fence. (Tr. at 16, 46.) Deputy Simonelli and Sergeant Garcia pursued him and eventually tackled him and placed him in handcuffs. (Tr. at 46.)

Other police officers ultimately discovered a firearm on the other side of the fence. (Tr. at 17, 24-25, 47.) Another officer and his dog also searched the vehicle and discovered a bag of methamphetamine. (Tr. at 17, 48.)

## ANALYSIS

Mr. Amaya maintains that when Deputy Simonelli attempted to lift his shirt, he initiated a warrantless search in violation of the Fourth Amendment. But even assuming that Deputy Simonelli's actions did constitute a search, this search was reasonable under Terry v. Ohio, 392 U.S. 1 (1963). When a "police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," he is entitled to "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id. at 30. "Such a search is reasonable under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken." Id. at 31. The court does not focus on the "actual motivations of individual officers," but looks objectively at the reasonableness of the officer's actions. Whren v. United States, 517 U.S. 806, 813-14 (1996); see also United States v. Manjarrez, 348 F.3d

881, 886 (10th Cir. 2003) ("An officer may pat-down a suspect if the facts available to the officer would warrant a man of reasonable caution to believe that a frisk would be necessary to protect himself.").

Here, Deputy Simonelli had reasonable suspicion to believe that Mr. Amaya was armed and dangerous.  Deputy Simonelli knew from Sergeant Garcia that Mr. Amaya's car had made a short-term stop at a known drug and gang-affiliated residence.  (Tr. at 13, 32.)  He observed Mr. Amaya acting nervously, sweating, and exhibiting behavior that could indicate drug use.  (Tr. at 39, 40, 54.)  Deputy Simonelli had performed a records check and was aware that Mr. Amaya was on federal probation and that he was documented as a Sureño gang member.  (Tr. at 20-21, 33.)  When Deputy Simonelli knocked on Mr. Amaya's window, Mr. Amaya responded by getting out of the car instead of rolling the window down, a behavior that caused Deputy Simonelli concern.  (Tr. at 37, 53.)  Mr. Amaya also stated that he was documented as a member of the Crips, a statement that did not match Deputy Simonelli's information that Mr. Amaya was a member of the Sureños.  (Tr. at 49.)  Finally, Mr. Amaya admitted to Deputy Simonelli that he was on federal probation for a gun-related charge.  (Tr. at 39.)

Taken together, these circumstances created a reasonable suspicion that Mr. Amaya was armed and that a Terry frisk was justified to protect Deputy Simonelli and others.  A weapons frisk can reasonably be based on a connection to a drug transaction.  United States v. Hishaw, 235 F.3d 565, 570 (10th Cir. 2000) (short-term traffic and hand-to-hand contact observed outside apartment justified pat-down).  And a connection to gangs, even if it is attenuated, can provide additional reasoning to conduct a Terry frisk.  United States v. Garcia, 459 F.3d 1059, 1066 (10th Cir. 2006) (stating that a gang connection provided an additional justification for the frisk, even

though the Defendant was merely associating with persons wearing gang attire).  While neither Deputy Simonelli nor Sergeant Garcia observed hand-to-hand drug contact, there were a number of factors that justified their suspicion that a drug transaction had just occurred.  These factors included the short stop at a known drug residence, the odor of methamphetamine that Sergeant Garcia noted, and Mr. Amaya's nervousness and sweating that Deputy Simonelli observed.  Further, Deputy Simonelli was reasonably concerned by Mr. Amaya's decision to get out of the car rather than roll down the window.  Finally, there were a number of factors associating Mr. Amaya with the Sureños gang, including his documentation as a gang member and his clothing.  Given these circumstances, Deputy Simonelli had reasonable suspicion to perform a frisk.

Mr. Amaya argues that the court should find that Deputy Simonelli's attempt to lift Mr. Amaya's shirt is analogous to a search of Mr. Amaya's pockets, an action that the Supreme Court has found in a number of cases to exceed the scope of a frisk.  Sibron v. New York, 392 U.S. 40, 62 (1968) (holding that a police officer violated Mr. Sibron's Fourth Amendment rights when he reached into Mr. Sibron's pockets, since he had only seen Mr. Sibron speaking with known drug addicts but not exchanging any items with them); Minnesota v. Dickerson, 508 U.S. 366, 378 (1993) (holding that cocaine seized from a suspect's pocket was inadmissible because the officer conducting the pat-down could not have reasonably thought that the lump was a weapon).  But, given that Deputy Simonelli was never able to lift Mr. Amaya's shirt, this case does not hinge on the scope of Deputy Simonelli's search.  Instead, the court's focus is on whether Deputy Simonelli had a reasonable suspicion to initiate a Terry frisk, which he did.  And since Deputy Simonelli did not reach into Mr. Amaya's pockets, the court is not persuaded that the cases on which Mr. Amaya relies are apposite to these facts.

Because the court finds that no Fourth Amendment violation occurred, it need not address whether the evidence that was discovered after the search was the product of an exploitation of any underlying illegality. As a result, the evidence of Mr. Amaya's flight is admissible, as is the gun that was later discovered.

ORDER

For the reasons stated above, Mr. Amaya's motion to suppress is DENIED.

SO ORDERED this 23rd day of August, 2012.

BY THE COURT:

_____
TENA CAMPBELL
U.S. District Court Judge